# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-23-00083-CV

**W. G., Appellant**

v.

**Texas Department of Family and Protective Services, Appellee**

## NO. 03-23-00084-CV

**C. G. and W. G., Appellants**

v.

**Texas Department of Family and Protective Services, Appellee**

### FROM THE 274TH DISTRICT COURT OF HAYS COUNTY
### NOS. 20-1388 & 20-1388-A, THE HONORABLE JOE POOL, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant W.G. (Mother) appeals from the final orders terminating her parental rights to her sons Derek, born in June 2010, and Yuri, born in September 2019.[1] C.G. (Father) appeals from the final order that named him possessory conservator of Yuri, with supervised-visitation rights. As explained below, we affirm the orders.

---

[1] For the children's privacy, we will refer to them by aliases and to their family members by their relationships to them. *See* Tex. R. App. P. 9.8.

## PROCEDURAL AND FACTUAL SUMMARY

In July 2020, after several instances of domestic violence between the parents in the presence of at least one of the children, the Department sought and was awarded conservatorship of the children. Derek was placed with his father, from whom Mother had divorced several years earlier, and Yuri was placed with his paternal aunt (Aunt). The Department eventually changed its goals from family reunification to asking that Mother's rights be terminated, and that Father be named possessory conservator with supervised visitation. In January and March 2022, the associate judge held a final trial, severing the proceedings related to Yuri into a different cause number at the end of trial. On May 18, 2022, the associate judge signed final orders terminating Mother's parental rights to both boys, finding that termination was in the children's best interest and that Mother had placed or knowingly allowed them to remain in conditions that endangered their well-being; engaged in conduct or knowingly placed them with others who engaged in conduct that endangered their well-being; and failed to comply with a court order establishing specific actions necessary for Mother to regain custody following the boys' removal for abuse or neglect. Father was appointed Yuri's possessory conservator, Aunt was appointed Yuri's sole managing conservator, and Derek's father was appointed Derek's sole managing conservator. After the parents sought de novo review, the referring court held a de novo hearing in January 2023 and soon after signed orders affirming the associate judge's orders. These appeals followed.

In the trial before the associate judge, Officer Matthew Michaelson of the Kyle Police Department testified that he responded to an altercation between Mother and Father on March 16, 2020. Officer Michaelson stated that Mother told the responding officers that she and Father had been arguing and that Father had kicked her and struck her in the head. He also testified

2

that both children were present and had witnessed the assault. Father was arrested for assault causing bodily injury to a family member, and Officer Michaelson filed for an emergency protective order on Mother's behalf and notified the Department about the incident.

Officer Gabriel Vasquez of the Austin Police Department testified that he responded to another altercation that took place between the parents on June 30, 2020. When he arrived on the scene, he saw Father running away from the area. Father was limping, crying, "hunched over his injuries," and out of breath. Officer Vasquez spoke to both parents and testified that Yuri was present, either in a car or in Mother's arms. Father reported that Mother had hit him repeatedly "in the face with a closed fist and kicked him in the groin" and that he was running away when the police arrived because "he was trying to get away from his wife" because Mother was hitting him; Mother admitted that she "had slapped him in the face because of him talking to her in a disrespectful manner." Officer Vasquez was asked whether he noticed anything about Mother's behavior to raise concerns about her mental health, and he responded, "Some of the statements she was saying were not making sense."

Officer Vasquez testified that Yuri had been present during the assault. He explained that he was concerned about the child because it was hot, the individuals had "been out there for some time," and Yuri's face was sweaty and "was getting red and flushed." Officer Vasquez asked Mother to remain in the shade or in her car with the air conditioning running, but Mother responded several times "that the child was fine." Officer Vasquez was also concerned about Yuri's safety because of Mother's behavior and "was trying to formulate a plan how to retrieve the child safely and get—give [Father] the child. We didn't know how she was going to act once she found out she was going to be placed under arrest." Officer Vasquez did not believe that Mother's erratic behavior was due to drugs or alcohol.

Kyle Police Officer Donald Lovelace testified that he responded to a disturbance call on February 20, 2022, in which Mother assaulted the daughter of her landlord by pushing her during a dispute after the landlord asked Mother to move her car. Mother told Officer Lovelace that she did not want to move her car "due to there being an owl in one of the vehicles. And she had a prior experience, a negative experience with an owl or something with an owl based off of an abortion someone had." After speaking with the people at the scene, he tried to place Mother under arrest for assault, Mother pulled away "to a point where we had to pin her up against the wall to effect the arrest." Officer Lovelace said that "there appeared to be some sort of mental health concerns" and did not believe that Mother was under the influence of drugs or alcohol.

Amanda Mason, a Family Based Safety Services worker with the Department, testified that when she was assigned to the case in April 2020, after Father's arrest for assaulting Mother, the parents had already been referred to parenting classes, Father had been referred to anger management classes, and Mother had been referred to a psychological assessment. The initial concerns were "[t]he domestic violence and unhealthy relationship between [Father] and [Mother], concerns also with their young child, [Yuri], being present during those incidences, and also [Mother's] untreated mental health." The Department decided to seek the children's removal in late June, before Mother's arrest for assaulting Father, "after the parents had been completing some services but were not fully cooperative with the Department, as far as following safety plan recommendations." The parents would not agree to a safety plan and instead "had tried to reconcile their relationship on their own plans," resulting in "domestic violence altercations that had continued since the [emergency protective order] expired in May."

The Department sought the children's removal after Mother was arrested for assaulting Father on June 30, 2020. Mason testified that after Mother was released from jail, Father

picked her up, telling Mason that "he was her husband and he was going to support her," and Mason had concerns about the parents' relationship due to "domestic violence and their inability to stay away from each other." In addition, Mason testified that in her interactions with Mother, Mother was "very easily irritable," "would not allow us access into her home after a period of time to assess the children," and would "cut off conversations" with Derek that were intended to assess the safety of the home. Finally, Mason testified that Derek made outcries that Mother had hurt him by "bending his fingers back to the point of hurting" and "[p]inching his face," and said he did not want to see Mother.

Department supervisor Kalyn Noyes was the family's caseworker from September 2020 until September 2021. She testified that when Mother was arrested in June 2020, Derek was placed with his father, whom he had not seen in years. Derek appears to have bonded with his father, who had complied with his service plan, and Noyes had visited Derek in his father's home and had no concerns about the home or the relationship between Derek and his father. Noyes testified that during her time on the case, Derek "was very clear that he did not want to see his mom. He did not want visits. He wanted to stay with his dad. He felt safe and he wasn't worried about anything happening to him at his dad's house."

Noyes said that Derek unexpectedly made one request for a visit with Mother in March 2021 after always before saying that he did not want to see her, but shortly before the would-be visit, he changed his mind and said he did not want to see Mother. "[A]fter further talking with the child advocates and the child's therapist," Noyes said, "we did not pursue the visit." Noyes later learned that Derek had "requested the visit because he was promised a Pokémon card that he had been wanting," and she testified that the Department was "worried that [Mother] was trying to bribe him into have a visit specifically for that Pokémon card." In addition, Noyes

said, Mother continued to send text messages to Derek on his phone, despite being ordered not to contact him, and had instructed Derek to delete her messages. Noyes further testified that Derek's school became concerned about Mother in October 2020, when she set up a parent-teacher conference insisting that he needed to stay after school for tutoring when the school did not believe he needed that service. Because Mother "was trying to get the school to keep him there after hours," the school was worried that Mother "was going to be there and try to pick [Derek] up or locate him and speak to him" after Derek "had been very clear he did not want that." Noyes also testified that Mother went to the school at some point to try to drop off books for Derek, in violation of a court order that she not approach Derek or go to the school.

Noyes testified that in addition to the incidents of domestic violence between the parents that led to the children's removal, other altercations took place after the children were removed: in October 2020, when Father left the home after an argument, Mother "chased him out of the house and bashed in his driver's side window with a hammer," and his car was keyed overnight after he went to his parents' house; in the spring of 2021, Mother slapped Father during an argument; and again in the spring of 2021, after an argument about finances, Father woke up to find the word "dinero" had been keyed into his vehicle. Noyes was not aware of any altercations between the spring 2021 incidents and her transfer off the case in September 2021.

Noyes testified that during her time on the case, Mother had not complied with the court orders that might allow her to regain custody. Noyes was concerned about Mother's mental health because of her past hospitalizations and reports that "she had suffered with anxiety and depression, and what she was using to treat those mental health concerns, and how it was affecting her relationship and her everyday life," but Mother had not addressed her "[o]ngoing mental health needs," telling Noyes that she did not believe she had such needs. Nor had Mother given

permission for the Department to obtain her psychiatric records from before the Department's involvement. In addition, Mother did not always make her visitations with Yuri, did not always provide an explanation for missing a visit, and was initially uncooperative, refusing to provide her address so that Noyes could visit her residence. Noyes agreed that Mother had participated in therapy, had been successfully discharged from therapy, and had completed a lengthy domestic-violence-prevention class, but Noyes believed Mother had read her service plans like "a checklist" and had not changed her behavior in response to her services.

As for Father, although he had completed his services, Noyes said that he had continued to engage in a relationship with Mother despite the Department's "domestic violence concerns." Noyes did not agree when asked whether Father had shown that he had learned from services when he said he ceased his relationship with Mother in the spring of 2021 because "in June or July they were, again, in a relationship," and both parents had told her "that they wanted to continue their relationship because they loved each other."

Noyes explained that the Department was seeking to terminate Mother's rights and limit Father's rights despite their having engaged in and completed many services because the parents had not shown "behavioral change throughout the case" and there had been "no changes that we could safely recommend a child returning to that environment." Noyes said that there were "ongoing concerns regarding the relationship between the parents," noting that there had been many arguments and "multiple incidences—incidents throughout the case that resulted in damages to vehicles, physical—physical altercations between the parents." Noyes also said that court orders related to contact between the parents or between Mother and Derek did not seem to affect the parents' behavior, saying, "It's a piece of paper to them." She testified that there was a "pattern of behavior" in which the parents would insist that they were no longer in a relationship but "then

7

two to three months later, we're going to have another incident of domestic violence. And that was just a—a repeated pattern. There were no behavioral changes. They weren't learning anything from services, it appeared." Noyes said, "It was—it was a safety concern to send a child back to the environment."

Noyes testified that the Department believed that it would significantly impair Yuri's physical and mental health if Father were appointed his sole managing conservator. The Department asked that Aunt be named Yuri's sole permanent managing conservator because she had "been able to show that she's protective of [Yuri]," was meeting his needs, and was "able to maintain a healthy relationship with her brother in regards to [Father] and [Yuri]." Noyes had spoken to Derek about the possibility of termination of his mother's rights and what that would involve, and "he was like, well, I—I really don't want to see her, so what would be the big difference." She said, "He's happy with his dad and he is very scared that one day he won't be with his dad. So, he's—he's been very consistent that he wants to stay there."

Department caseworker Francisca Jaramillo had been the family's caseworker since September 2021. She testified that Mother had not completed her service plan, explaining that Mother had completed several courses but "has not done a behavioral change such as individual therapy. She hasn't maintained her mental health. I've asked for her to provide documentation that she's keeping with her mental health and she has not done so." Mother had not provided records from her mental-health providers, told Jaramillo that she would not sign a release form, and had not discussed with Jaramillo whether she was taking any medications. Jaramillo had neither observed any visits between Mother and either of the children, nor had she visited Mother's residence. Mother had stopped having consistent visits with Yuri by the time Jaramillo was assigned, and Jaramillo said:

8

She would say she was going to be at the visit and then cancel last minute. And then when asked about it, she said she'd contact her attorney. And then I asked her again why she did not want to have visits with [Yuri], and she said because the case was almost over and she didn't want it supervised by the Department.

Jaramillo testified that the Department was asking that Mother's rights be terminated because of her mental health and "her ongoing criminal activity."

Father had completed his safety plan, but Jaramillo was concerned that he may still be in a relationship with Mother. She explained that although there was no evidence that the parents were still together, "in October, [Mother] was asking for [Father] to return back into her home. When I would ask [Father], he would deny the relationship, but he did say that if her mental health was right, then maybe. So, that is a concern that there was that possibility." Father was having weekly unsupervised visits with Yuri, and there was no indication that Father was allowing Mother to see Yuri during those visits. Jaramillo believed that it was in Yuri's best interest to maintain his relationship with Father but for Father's rights to be limited.

Arnold Martinez, Derek's therapist, had been working with Derek for about a year. Derek had improved in terms of his self-esteem, anger management, and depression, and Martinez testified that Derek "has an outstanding relationship with his father" and was happy in his father's home. Derek has a "very positive, encouraging, supportive relationship" with his father and is "thriving" in that placement. As for Mother, Martinez said that Derek "doesn't want to associate with [Mother] . . . and basically doesn't want anything to do with her." Derek "still harbors a lot of resentment and anger towards" her, has said that "he's afraid of her," and "told [Martinez] that he's worried and depressed at times because he feels that he's going to be forced to reunite with his mother." Derek told Martinez about instances in which Mother "was abusive towards him. Also drugs [were] involved and that she had psychotic—is not a stable parent." He had described "several instances where he got slapped," the incident in which Mother bent his hand backwards,

9

and "general verbal and physical abuse," and he told Martinez that Mother had been abusive to him "all his life." Martinez testified that Mother's "behavioral unpredictability" and "anger episodes" had frightened and "traumatized" Derek and that Derek feels "rejected" by Mother due to her abusive behavior. Martinez believed it was in Derek's best interest for Mother's rights to be terminated.

Mother testified that she and Father ended their relationship in March 2020, when the Department began its case but later tried to reunite and "asked for help with, like, marriage counseling and family counseling." Mother testified about her June 30 assault on Father, saying that she and Father had been "stressed" and arguing over a couple of days and "wanted help, like family counseling," because they were both dealing with feelings of jealousy. Mother was trying to tell Father about "something that had happened to [her] when [she] was younger," and when he "began yelling some really mean things at" her, Mother slapped and punched him while she was carrying Yuri. Mother testified that she "was in deep regret and deep remorse after" and that she recognized that it was "really stupid of [her]."

Mother testified that she is bipolar and has post-traumatic stress disorder and said she was "seeking counseling and therapy and medicine." She had completed an intake with Dr. Reynolds about a week before trial, explaining that she had done an earlier intake with him about a year and one-half earlier but had to change to another doctor when she moved from Hays County to Austin; she had just returned to Dr. Reynolds because she had moved back to Hays County. Mother had been prescribed two medications but did not like the side effects, so she stopped taking them about a month before trial, and she testified that she was going to ask for a new prescription when she returned to Dr. Reynolds in about ten days.

10

Mother testified that Derek was not telling the truth when he claimed she had bent his hand back. She said that he had been yelling at her, calling her names, and getting in trouble at school, and after he threw his phone at her, she only "squeezed his hand" and had not bent it back. Mother testified that she and Derek had an understanding that she would "repeat something to him four or five times," and that if he did not listen and do what she asked, she would raise her voice and "there's either a timeout or his phone is taken away or PS4 is taken away. There's a—an order of discipline." Mother also testified that Derek had been falsely told that Mother had not let him see his father, saying, "I understand that he's trying to say that I'm crazy and I'm this and I'm that, but he is ten years—he was ten years old when this started. And he is hearing these things from other people." Mother stated that all her visits with Yuri had gone well except for one in which she got frustrated with the person who was supervising the visit, asking him to stop coming into the room and instead to just observe through the mirror and cameras. When the man ignored her requests to leave, she swore at him and told him to get out. However, she testified, she was able to calm herself down and continue the visit. Mother also testified that she had been blamed for being late to a visit when the caseworker acknowledged to her that he had gotten the time wrong and had picked the child up early.

Mother acknowledged that she had keyed Father's car and smashed his window, but stated that the car belonged to both of them and that she had broken his window because he "had taken something without [her] permission" and refused to give it back. In addition to her altercations with Father, Mother testified about an incident that occurred between her and a neighbor in January 2022, shortly before trial. She initially had a good relationship with her neighbors but "one day I was in a hurry and I was going up the stairs and I asked—I asked the man to—I said, 'Hey, watch out.' And he said, 'You watch out.' And he yelled at me and he snared

11

[sic] at me and I—I just—I kept walking." Later, she saw the neighbor walking his dog, who "was happy and she was frolicking and he choked her on purpose." "[F]or a couple of months, [she] noticed things that he was doing," and Mother testified that one day, when she was going for a walk at the same time the neighbor was walking the dog,

> he was looking at me very angry. And I . . . moved the dog out of the way and I said, 'Don't do that.' And I walked away. And when I got back to my apartment, I knocked on the lady's door, his wife's door, and I told her, I said, 'Hey, I just pushed your husband.' And she said, 'What?' She yelled at me and she said, 'Why did you do that?' And I told [her] why I did that. And she called the police.

Mother denied that she had kicked him and punched the neighbor in the stomach. She was kicked out of the apartment complex as a result of the incident.

Mother also testified about her February 2022 arrest for assault on her landlord's daughter, asserting that her landlord asked her to move her car but that she was tired and wanted to have dinner, so she instead made a joke in Spanish about owls because her landlord had asked her to teach him Spanish. Mother went inside to eat dinner and texted her landlord that she would move her car later, but his daughter started banging on her door and screaming at her that she had to move out. Mother testified that she simply shoved past the woman when she would not move out of Mother's way.

Mother believed that she had fully complied with her service plan and the court's orders and asserted that she had proven that she could take care of herself and her children. She testified that she had paid child support to Derek's father throughout the case, although she conceded that she had not paid him in February or March 2022 or given him half of her stimulus check as ordered. She also conceded that she had not maintained face-to-face contact with her caseworker or reported her February 2022 arrest to the caseworker—she said she instead reported it to her attorney because every time she had questions, the caseworker would tell her to ask her

12

attorney. Mother denied that she had gone to Derek's school and said she only had emailed about a book she wanted his teachers to sign. Mother claimed she had signed a release form for her medical records, denied using drugs, said that Derek was lying when he made that allegation to his therapist, and denied interfering with Derek's father's visitation rights. Mother had lived in five residences during the case and at the time of trial was renting a single room in a house; two other men lived there, and although Mother did not know them, she thought it was a safe and stable environment for a child because she had her own space. Mother testified that she had been employed by Circle of Care as a children's speech therapist since 2019 but that she had not received a paycheck from them since April 2021 because the speech language pathologist who was supposed to supervise Mother's work had decided she was too busy to do so. Mother had "just started back up with Circle of Care because there was a willing supervisor who could supervise me on her license." In the meantime, she had worked one job "for three or four days" before being informed that they were not busy enough to keep her on; had been a substitute teacher in Hays Consolidated Independent School District; and had worked as a bus monitor.

Mother believed that her mental health was under control and insisted that she had "never had an anger management problem." Mother had "remembered some memories that [she] had suppressed" and got "angry at a lot of people" but had since learned to cope and "to forgive [herself] for what happened to [her]." Mother was not concerned that she and Father had engaged in domestic violence in the presence of the children. Asked if she and Father were still trying to continue their relationship, Mother responded, "At this point I'm just not sure. There's a lot of— I answered the question. No. To answer that, no." Later in her testimony she reiterated that she and Father did not intend to continue a relationship. Mother and Father had filed for divorce, and that proceeding was pending at the time of trial.

13

Father admitted that he and Mother had engaged in domestic violence in the children's presence and testified that an environment of violence was not safe for children. He said, "It wasn't, like, often. It was just, you know, like any normal couple. But yeah. We made a mistake twice or three times when we did it in front of the child—of our children." Father testified that he last saw Mother in early 2021: he and Mother had signed a year lease on an apartment—the same apartment she was kicked out of after assaulting her neighbor—but he only lived there for a month and left after the last incident of violence in about March 2021. Father moved in with his parents and was still living there at the time of trial.

Father testified that he had completed his services, including a psychological evaluation, which did not recommend other services, and a batterer's intervention course, which taught him to listen before he reacts and to walk away from confrontations. Father was working a steady job, paying child support, and regularly visiting Yuri, and his only pending criminal issue was the pending March 2020 assault charge. Father had met Derek's father in the past and said he did not have any problems with him and could help Yuri and Derek maintain their relationship. During his marriage to Mother, Father rarely saw Derek's father pick Derek up for a visit, "[p]robably once or twice in almost three years," and Father testified that Derek often expressed disappointment in not having more visitations with his father.

Father believes Mother has problems with anger management and did not know if she had addressed her mental-health issues, saying, "I think she did mention that, yeah, she has anger management and—but the other stuff about the mental health, I don't know. I'm not a specialist on that. . . . I just know that, you know, all humans are triggered for something." He did not believe that Mother posed a danger to her children: "It's just—you know, our biggest

mistake was just argue and fight and all this. Argument about stupid stuff. . . . [B]ut as far as her being a mother, I don't think—I don't think so."

Aunt testified that Yuri had lived with her since his removal in August 2020, when he was ten months old. Yuri was doing well, was growing and developing quickly, and did not have any developmental or medical issues. Aunt had observed Father with Yuri and said that he is a good father and that her only concern is that she is not sure that he is no longer with Mother. Asked why she thought the parents might still be in a relationship, Aunt answered, "It's just something that I think. I'm not sure." Aunt thought there was "something wrong with" Mother, but she testified that it would be Yuri's best interest to maintain a relationship with Mother, saying, "It's his mom." Aunt testified that she was committed to providing a safe and stable home for Yuri and that she would follow all orders related to visitation and contact.

Court appointed special advocates (CASA) supervisor Elizabeth Medellin testified that she and CASA recommended that termination of Mother's rights was in the best interest of both children. She explained that Mother "struggles to accept the reasons for removal and her—and her role entirely. I think she struggled to maintain her mental health throughout the duration of the case, which is cause for concern."

Medellin had spoken with Derek about his wishes, and he "has consistently expressed not wanting to have any contact with" Mother. Derek's father's home was appropriate and meeting all of Derek's needs. Asked why Derek's father had so few visits with the child before he was placed in the home, Medellin said, "I've heard different stories from all of the parents. And so, I understand that there's truth that lies in there somewhere, but I believe all—that they're probably both at fault for that." Medellin had discussed sibling visits with Derek and his father, and the brothers had one visit, but Derek "really didn't want to entertain the idea." CASA was

concerned that Derek went from living with Yuri and Mother to "all of a sudden not wanting to see either one," but Medellin said that Derek's therapist had "address[ed] parental alienation" and "ruled it out."

Medellin had witnessed visits between Yuri and each of his parents and said that the visits went well, and that Yuri appeared bonded to both Mother and Father. Medellin testified that Aunt "does a very good job of being protective" of Yuri but that "there is a possibility of [Father] and [Mother] potentially getting together and kind of ganging up on her, like kind of pushing her a little bit, which is another reason that I think it would be in the best interest to kind of separate them further." CASA recommended that Yuri be placed with Aunt, with Father having supervised visitation rights, and Medellin explained:

> I think that [Father] has understood his role in the removal of [Yuri]. And I believe that he has made efforts to change his—his own behaviors. But I do think that—in my opinion, I think he struggles a bit because he has expressed to me that he wants [Mother] to continue to be a mother to his son, which is understandable. But I think that he struggles a bit in—in understanding appropriate boundaries with that and being able to be a protective parent. I think he struggles actually putting [Yuri] first before his relationship with [Mother].

She said that CASA was concerned that if Father had unrestricted access, he would allow Mother to be around Yuri. Medellin explained that in late August 2021, Father told her that "he still does keep in contact with [Mother] from time to time. And that he does help to financially support her if she is needing assistance with that." Medellin said, "I think that he struggles just to sever that tie." And although the parents had filed for divorce, Medellin was not sure "if that's something that he's actually wanting to stick with. So, there is some concern there." Medellin said Father "wants [Yuri] to have his mother in his life, which is completely understandable. I think that maybe he underestimates the severity of [Mother's] condition and the safety concerns that that poses to his child."

16

Derek's father testified that he and Mother stopped living together in mid-2017, when Derek was about seven. During their time together, Mother was once admitted to a mental hospital for about two weeks. He was granted visitation rights in the divorce and said he tried to exercise visitation "as much as I could without sacrificing the mental health of my son," explaining that every exchange involved conflict with Mother or Father. At the time Derek came to live with his father, it had been "a few years" since they had seen each other, although Derek's father also said he thought he had seen Derek "a couple of times" or a "handful of times" in 2018, 2019, and 2020. He had never had any interest in co-parenting with Mother, testifying, "I didn't feel safe around her or her husband." He explained that Father was always present during exchanges and that Mother had told him that Father "was part of an organization and that he's dangerous and this and that." He also testified that in one exchange "she was very upset with me and that she was in my face. Almost to the point where she was going to hit me. And I—I had to—I just had to leave. And this is in front of [Derek]." Derek's father said that he did not think Derek was safe when he lived with Mother and Father but had lacked the financial resources to take Mother to court; he once called child protective services to initiate a welfare check. Derek's father said that Derek "just wants to be with me and he doesn't ever want to leave and he has no desire to visit with his brother or his mother." Derek worries that Mother "is going to show up and sign a paper and take him away," and his father said, "All I can do is reassure him and that, you know, nobody is going to take you away. [Y]ou're safe. He's an 11-year-old kid that's smart." Derek was doing well in school and sports, he has developed friendships while living with his father, and his father's job allows him the flexibility to spend a good amount of time with Derek after school. His father testified that when Derek first came to live with him, he was "like a lost boy almost. He wanted to be next to me like all—all the time. Whereas now, he still wants to spend time with me all the

17

time, but he's confident and, you know, outgoing and he's, I guess, himself. His—his youth self."

He worried that if Derek were required to have visitation with Mother, he would lose "the progression that he's had and how far he's come to overcome the challenges that he's had, given everything that's happened."

At one point during the testimony, the associate judge said:

> And just for the record, folks, I took [Father] off the video a good while back because his—signals he was making and things he was doing to signal answers, et cetera. And, [Mother], I just took her off because she started doing the same thing. But her behavior—I want this to be on the record. Her behavior during the other testimony was most bizarre. She was reading a book for a big portion of the testimony and then she got up and left the room for a good bit of time. So, you have to—if you're in court, you have to act like you're in court, folks. Okay?

And after the conclusion of the evidence and the attorneys' closing arguments, the judge stated that "based on [Mother's] failure to comply with my court orders, my observing her bizarre behaviors, I don't have confidence that she would follow any rules that this Court set down, especially if she wasn't coming back to the court." The associate judge also said, "I believe that [Father] did try to intimidate [Derek's father] during pickup times. I believe [Mother] told [Derek's father] that [Father] was a member of a—an association in order to put fear in him." When discussing her decision about Father's parental rights, the judge stated, "[Father], everyone has managed to tell me that you deserve another chance. And if even one of these people had suggested that I terminate your parental rights, I would have." The judge urged Father to "look into your lifestyle, the way you treat the people around you," and cautioned him that if he tried to intimidate Aunt, he would lose his visitation rights altogether. The associate judge signed orders terminating Mother's rights to both children under subsections (D), (E), and (O); appointing Derek's father as the child's sole managing conservator; appointing Aunt as Yuri's sole

18

managing conservator; and appointing Father as Yuri's possessory conservator with rights to supervised visitation.

In the de novo hearing in January 2023, Mother testified that she and Father were separated and that their divorce proceeding was still pending. She said that the case started because "I slapped my ex. I'm not proud—I'm not proud of slapping my ex . . . but I did slap him," and testified that she had seen two therapists, completed a protective parenting class, completed a batterer's intervention course, and signed releases for the Department "to obtain all the documents related to [her] services." Mother was working at a barbeque restaurant, where she had started one week earlier, and had moved into a new residence in May, which has an extra bedroom for the children. She testified that if the children were returned, Derek would attend a public school very near to her residence, and she would find a day care for Yuri. She did not believe that Derek did not want to see her and said that "there was a time where he did text me and he did say that he wanted to spend time with [Mother] and his brother." Mother testified that she had completed all her services and wanted her children returned to her but said that she would accept it if she were only granted visitation.

Mother was asked if she was currently seeing a psychiatrist, and she answered, "The clinic is right down the street. And I call the lady—the secretary lady every once in a while. She's very, very kind. I did continue services afterwards, and I was cleared by the doctor. He said I was clear to work." Mother testified that she had been diagnosed with bipolar disorder and occasionally would "get sad and depressed" but said her doctors had not put her on medication: "My doctor left it up to me. He said . . . you can exercise. You can go to the park. You can practice what you choose. He left it up to me, honestly." She later clarified that she had been prescribed something for bipolar disorder but did not like the way it made her feel. She "switched

the medication several times" while working with her therapist and doctor, and said she was told, "If you choose to exercise, if you choose to get vitamin D, if you choose to eat healthy and follow those routes and those alternatives, then that's your choice." However, she conceded, her doctor did not "necessarily tell [her] not to take [her] medication."

Mother denied that she had a "continuing pattern of domestic violence." Mother described the January 2022 incident with her neighbor, saying that when she walked by him, his dog growled at her, and she "pushed the dog away" because she did not want the dog to bite her. She denied that she had kicked and punched the neighbor but said she would not be surprised that the police report says that she had. As for the February 2022 incident with her landlord's daughter, Mother did not know if she had a charge pending related to the altercation, which she described to the referring court as follows:

> When I had moved in with a roommate [and] I was trying to get back inside of my room and his daughter would not let me go back in my room and get my phone and my keys to leave. And it was actually her dad's birthday and—I was just very confused at what was going on. I—I did not know prior before I moved there that his wife had passed away and that his best friend had killed himself in front of him. And just with living there with him, I—I did not feel comfortable living there with him for the two weeks that I was there.
>
> And when his—when his daughter arrived, she was yelling at me to get the fuck out and to leave and—she was standing in my face and yelling at me for about five, seven minutes. And I was asking her nicely to please get out of my face. And then at one point, I was just observing her. And I was like, oh, my gosh—like, you probably just need a hug. Like, your mom passed away a few years ago.
>
> And I—you know, like, you're—so I said, Can I hug you? Are you okay? And she's like, No, you can't. And she—she kept getting in my face. And when she physically put her hands on me, I pushed her back so I could get back in my room and get my keys so I could leave. And she yelled and she said that I hit her; and she ran to her dad. And she—she told her dad, She hit me, she hit me.
>
> And they called the police and the police showed up. And I just—I told the police what happened; and they wouldn't let us, like, stand together where I could say, I did not hit you. You were hitting me and you were yelling in my face.

20

Mother further testified that she had been arrested for criminal trespass in July 2023 due to a "miscommunication" with the parent of a client to whom she was providing speech therapy and denied that she had "picked up a child and [was] trying to leave with someone else's child."

Medellin testified at the de novo hearing, explaining that since the March 2022 trial, she had stepped down as a supervisor and had become the children's CASA volunteer to "keep consistency with the case." Medellin's concerns related to Derek "have been very consistent throughout the case"—Derek had said "time and time again that he does not want to have any contact with his mother. He does not want to pursue a relationship with his mother. He has gotten to the point where he's actually asked us to stop asking him about his mother." Medellin was asked about the time Derek wanted to see Mother, and she said, "My understanding was that he was wanting to get items from his mother," and it later "came across through other evidence that was introduced that he had had that conversation with other individuals; and that his mother had been talking to him about giving him those Pokémon cards that he wanted." Medellin thought that it was in Derek's best interest for Mother's rights to be terminated.

Medellin further said that in November 2022, Mother "forcibly entered the home of [Yuri's] placement," resulting in the police being called, and testified that Mother had "consistently shown that she does not follow court orders." Medellin did not think Mother was "quite aware of the safety concerns that she poses to her own children," so she recommended that Mother's rights to Yuri be terminated. As for Father, Medellin testified that she believed it was in Yuri's best interest for Father's visits to continue to be supervised.

Following the de novo hearing, the referring court signed an order affirming the associate judge's orders. On appeal, Mother challenges the legal and factual sufficiency of the findings of statutory grounds and the finding that termination of her rights is in the children's best

interest. Father argues that the evidence is legally and factually insufficient both to overcome the presumption that he should be named a managing conservator of Yuri and to support a finding that his visitations should be supervised.

**MOTHER'S ISSUES**

Mother challenges whether the evidence established that she endangered the children through her conduct and through the environment in which she placed them or allowed them to remain or she failed to comply with a court order setting out the actions necessary for her to regain custody; that termination is in the children's best interest; or that it is not in the children's best interest for her to be appointed their conservator.

We review the sufficiency of the evidence supporting a trial court's termination decree under well-established standards. The Department must prove by clear and convincing evidence that the parent engaged in conduct that amounts to at least one statutory ground for termination and that termination is in the child's best interest. Tex. Fam. Code § 161.001(b). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007; *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018). "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *A.C.*, 560 S.W.3d at 630. In reviewing legal sufficiency, we view the evidence in the light most favorable to the factfinder's determination, including undisputed contrary evidence, and assume the factfinder resolved disputed facts in favor of its finding. *Id.* at 630–31. In reviewing factual sufficiency, we weigh the evidence favoring the finding against disputed evidence and consider whether the evidence "a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or

22

conviction that the finding was true." *Id.* We must "provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).

### *Statutory Grounds*

Stability and permanence are paramount in the upbringing of children, *In re M.E.-M.N.*, 342 S.W.3d 254, 263 (Tex. App.—Fort Worth 2011, pet. denied), and a course of conduct that subjects a child to a life of uncertainty and instability endangers the child's well-being, *A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 699 (Tex. App.—Austin 2019, pet. denied) (quoting *Jordan v. Dossey*, 325 S.W.3d 700, 723 (Tex. App.—Houston [1st Dist.] 2010, pet. denied)). Subsection (D) focuses on the child's physical environment, and the parent's conduct can be a factor in producing an environment that threatens the child's well-being. *J.G. v. Texas Dep't of Fam. & Protective Servs.*, 592 S.W.3d 515, 524 (Tex. App.—Austin 2019, no pet.) (quoting *In re M.D.M.*, 579 S.W.3d 744, 764 (Tex. App.—Houston [1st Dist.] 2019, no pet.). In considering subsection (E), "the focus is on the parent's conduct—including acts, omissions, or failures to act—and, specifically, on whether the evidence shows that the parent engaged in 'a voluntary, deliberate, and conscious course of conduct' that endangered the child's physical or emotional well-being." *V.P. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-19-00531-CV, 2020 WL 544797, at *4 (Tex. App.—Austin Feb. 4, 2020, no pet.) (mem. op.) (quoting Tex. Fam. Code § 161.001(b)(1)(E)). "A single act or omission can support termination under subsection (D), but termination under subsection (E) must be based on "a voluntary, deliberate, and conscious course of conduct." *J.G.*, 592 S.W.3d. at 524. Evidence of

domestic violence may weigh in favor of a finding of endangerment under subsections (D) and (E). *See id.*; *In re P.W.*, 579 S.W.3d 713, 727 (Tex. App.—Houston [14th Dist.] 2019, no pet.).

Mother argues that the evidence is legally and factually insufficient to show that she endangered her children by her own conduct or by their environment. However, she downplays or omits evidence that Derek claimed to have been abused for years, including his allegation that Mother bent his hand backward; that she and Father engaged in repeated instances of domestic violence while at least one child was present, altercations that resulted in first Father's and then Mother's arrest; that Mother's mental health was concerning to law enforcement and Department witnesses; that Mother never provided a release so that the Department could fully assess her mental health; and that Mother continued to have altercations with Father and other individuals and was arrested twice after the children were removed. Although Mother notes that she refuted many of the Department's allegations and attempts to discount some of the evidence against her, the associate judge and referring court heard the testimony of the various witnesses and were entrusted with weighing the witnesses' credibility and determining how to resolve disputes in the evidence, and we cannot second-guess those decisions. *See In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021) ("Because the factfinder 'is the sole arbiter of the witnesses' credibility and demeanor,' appellate review must defer to the trial court's factual determinations, even in parental termination cases." (quoting *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009))). We also note that the associate judge observed on the record that Mother's behavior during the trial was "bizarre." Based on this record and the deference we must pay to the factfinder's determinations related to credibility, the associate judge and referring court could have found by clear and convincing evidence that Mother, by her continuing to engage in domestic violence with Father, continuing to maintain that unstable relationship, and failing to attend to her mental health,

24

endangered Derek and Yuri—both by her course of conduct and by placing them in an environment that threatened their well-being. *See, e.g.*, *T.A.W. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00364-CV, 2021 WL 81866, at *4 (Tex. App.—Austin Jan. 8, 2021, pet. denied) (mem. op.) (evidence of parent's mental instability or of domestic violence in home can support finding of endangerment under (D)); *R.Z. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-14-00412-CV, 2014 WL 5653272, at *6 (Tex. App.—Austin Oct. 29, 2014, no pet.) (mem. op.) (evidence of illegal drug use, domestic violence, and criminal activity by mother can support finding of endangerment under (E)). We overrule Mother's first issue.

### *Best Interest*

We review a trial court's best-interest determination in light of the considerations set out in *Holley v. Adams*, taking into account the child's wishes, their emotional and physical needs now and in the future, present and future emotional or physical danger posed to the child, the parenting skills of those seeking custody, any programs available to assist those seeking custody to promote the child's best interest, plans for the child's future, the stability of the home or proposed placement, conduct by the parent that might show that the parent-child relationship is inappropriate, and any excuses for the parent's conduct. 544 S.W.2d 367, 371–72 (Tex. 1976). The *Holley* factors are not exhaustive and need not all be proved, and a lack of evidence about some of the factors does not "preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). The child's need for permanence is the paramount consideration when determining a child's present and future physical and emotional needs. *L.R. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-18-00125-CV, 2018 WL 3059959, at *1 (Tex. App.—Austin

June 21, 2018, no pet.) (mem. op.); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). A parent's rights may not be terminated merely because the child might be better off living elsewhere, but the factfinder may consider whether termination and adoption versus an impermanent foster-care arrangement would better serve the child's best interest. *See L.R.*, 2018 WL 3059959, at *1.

Mother testified that she was employed and had a residence that is safe and appropriate, but the evidence does not indicate that Mother had been very stable in either area during the proceeding. She started at her most recent job just before the referring court held the de novo hearing, before that holding several jobs for short durations, and she had been kicked out of several residences due to altercations. Her most recent residence was shared with two other men whom she did not know before moving in. Mother had engaged in her services, completing required classes and being successfully discharged from individual therapy, and she claimed that she was attending to her mental health. However, although she insisted she had signed a release of information, the Department's witnesses testified that she had not allowed the Department access to her full mental-health records. Moreover, she had stopped taking her medications because she did not like the side-effects and she testified that she did not believe she had mental issues that needed to be addressed. She was about to restart psychiatric care with a doctor she had seen in the past but provided little explanation of how she had addressed her mental health in the interim. Multiple witnesses testified that Mother seemed to struggle with her mental health, and although Mother insisted that she did not have a problem with anger management, the evidence indicated that she had physical altercations with multiple people while the case was pending, including incidents happening shortly before and while the trial had commenced, and she was arrested for assault and criminal trespass after the children's removal. Thus, the evidence does not

26

indicate that Mother had obtained stability in terms of housing, employment, or her mental health. In addition, we cannot ignore the fact that the children were removed from the parents' care after multiple instances of domestic violence that took place while the children were present, including Mother's assault on Father while she was holding Yuri in her arms.

As for the children's wishes and their placements, Derek, who was between eleven and twelve when the case was tried, is living with his father and is by all reports doing well in school and happy and thriving in the home. Multiple witnesses testified that Derek is adamant that he did not want to have any contact with Mother now or in the future, although Mother testified that she did not believe that Derek did not want to see her and Father testified that she had been a good parent. Although Derek had not seen his father for a considerable time before going to live with him, there was evidence that Mother's conduct was a primary reason for that gap in visits, with Derek's father testifying that he stepped back from exercising his visitation rights in order to make Derek's life less tumultuous. Moreover, Derek told multiple witnesses that he wanted to stay with his father.

The evidence showed that Yuri was bonded to Mother, that she was a good parent, and that her visitations with him were appropriate. *See C.F. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00250-CV, 2021 WL 5018839, at *8 (Tex. App.—Austin Oct. 29, 2021, pet. denied) (mem. op.) (evidence that preverbal child is bonded to caregiver is relevant to best interest). However, he had also bonded with Aunt, with whom he had been placed when he was removed from the parents' care. Yuri is happy and doing well with Aunt.

The evidence shows that Aunt and Derek's father are meeting the children's needs, that their homes are stable, and that they have the resources and desire to continue caring for the children into the future. The Department witnesses and the children's CASA all testified that it is

27

in the children's best interests for Mother's rights to be terminated and for them to remain in their current placements.

Given the evidence presented at trial and again deferring to the factfinders' determinations on witness credibility and the resolution of evidentiary conflicts, we hold that the evidence is legally and factually sufficient to support a finding that termination of Mother's parental rights is in the best interest of both Derek and Yuri. We overrule Mother's third issue.[2]

### FATHER'S ISSUES

Father raises two issues, arguing that the Department did not overcome the presumption in favor of awarding Father managing conservatorship of Yuri and that the evidence does not support a determination that Father's visits with Yuri should be supervised.

We review conservatorship determinations for an abuse of discretion. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007); *A.S. v. Texas Dep't of Fam. & Protective Servs.*, 665 S.W.3d 786, 794 (Tex. App.—Austin 2023, no pet.). "As conservatorship determinations are 'intensely fact driven,' the trial court is in the best position to 'observe the demeanor and personalities of the witnesses and can "feel" the forces, powers, and influences that cannot be discerned by merely reading the record.'" *In re J.J.R.S.*, 627 S.W.3d 211, 218 (Tex. 2021), cert denied sub nom. *R.S.C. v. Texas Dep't of Fam. & Protective Servs.*, 142 S. Ct. 1139 (2022) (quoting *Lenz v. Lenz*, 79 S.W.3d 10, 19 (Tex. 2002); *Echols v. Olivarez*, 85 S.W.3d 475, 477 (Tex. App.—Austin 2002, no pet.)). Under this standard, we will reverse a trial court's judgment only if the record as a whole

---

[2] Because we have held that the evidence is sufficient to support the findings of best interest and statutory grounds under subsections (D) and (E), we need not consider Mother's second issue, challenging the finding of grounds under subsection (O), or her fourth issue, which argues that the evidence is insufficient to overcome the presumption that Mother should be appointed conservator of her sons. *See Spurck v. Texas Dep't of Fam. & Protective Servs.*, 396 S.W.3d 205, 222 (Tex. App.—Austin 2013, no pet.).

indicates that the court abused its discretion. *Id*. (citing *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982)). "A trial court abuses its discretion when it acts 'without reference to any guiding rules or principles; or in other words, [when it acts] arbitrarily or unreasonably.'" *Id*. (quoting *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (per curiam)).

Challenges to the legal and factual sufficiency of the evidence are not independent grounds of error under an abuse-of-discretion standard but are instead factors used to determine whether the trial court abused its discretion. *A.S.*, 665 S.W.3d at 795; *Zeifman v. Michels*, 212 S.W.3d 582, 587 (Tex. App.—Austin 2006, pet. denied). We ask whether the trial court had sufficient information on which to exercise its discretion and, if so, whether the court erred in applying its discretion. *A.S.*, 665 S.W.3d at 795. "The traditional sufficiency review comes into play with regard to the first question," and we then ask "whether, based on the evidence, the trial court made a reasonable decision, that is, that the court's decision was neither arbitrary nor unreasonable." *Zeifman*, 212 S.W.3d at 587. A trial court does not abuse its discretion if there is some substantive, probative evidence to support its decision. *Id.* "Evidence is legally sufficient when it would enable reasonable and fair-minded people to reach the verdict under review and is factually insufficient only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *A.S.*, 665 S.W.3d at 795.

The family code provides for a "rebuttable presumption that the appointment of the parents of a child as joint managing conservators is in the best interest of the child." Tex. Fam. Code § 153.131(b); *see also Lewelling v. Lewelling*, 796 S.W.2d 164, 166 (Tex. 1990), mand. granted sub nom. *Lewelling v. Bosworth*, 840 S.W.2d 640 (Tex. App—Dallas 1992, no writ) ("The presumption that the best interest of a child is served by awarding custody to a natural parent is deeply embedded in Texas law."). "[U]nless the court finds that appointment of the parent or

29

parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development, a parent shall be appointed sole managing conservator or both parents shall be appointed as joint managing conservators of the child." Tex. Fam. Code § 153.131(a); *see also id*. § 153.002 ("The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child."); *In re F.E.N.*, 579 S.W.3d 74, 77 (Tex. 2019) (per curiam) (op. denying pet.) (nonparent seeking conservatorship must establish that parent's appointment would significantly impair child's well-being, and "close call" should be decided in parent's favor). The link "between the parent's conduct and harm to the child may not be based on evidence which merely raises a surmise or speculation of possible harm," *In re De La Pena*, 999 S.W.2d 521, 528 (Tex. App.—El Paso 1999, no pet.), and "the evidence must support the logical inference that some specific, identifiable behavior or conduct of the parent will probably harm the child," *In re B.B.M.*, 291 S.W.3d 463, 467 (Tex. App.—Dallas 2009, pet. denied). "If the parent is presently a suitable person to have custody, the fact that there was a time in the past when the parent would not have been a proper person to have such custody is not controlling." *A.S.*, 665 S.W.3d at 797 (quoting *May v. May*, 829 S.W.2d 373, 377 (Tex. App.—Corpus Christi–Edinburg 1992, writ denied)).

Although the Family Code establishes a presumption in favor of parents, however, it also provides that in determining whether to appoint a parent as a managing conservator, the court should consider evidence of domestic violence committed by that parent within the two years period preceding the filing of the suit. Tex. Fam. Code § 153.004(a). Moreover, the code establishes a rebuttable presumption that it is *not* in the child's best interest for a parent to have unsupervised visitation if there is credible evidence of a history or pattern of family violence by

30

that parent *or* "any person who resides in that parent's household or who is permitted by that parent to have unsupervised access to the child during that parent's periods of possession of or access to the child." *Id*. § 153.004(e).

The evidence indicates that Yuri and Father are bonded and that Father has acted appropriately in his visits, which had been unsupervised for some amount of time before trial. Further, Father is employed and has been living with his parents in a stable situation, and he had complied with the requirements placed on him through the case, other than continuing a relationship with Mother well into the case.

However, the case began when Father assaulted Mother while she was holding Yuri in her arms, resulting in charges that were still pending against him at the time of trial, and the associate judge and referring court were required to consider evidence of that incident of domestic violence. *See id*. § 153.004(a). Moreover, throughout the case, the parents repeatedly broke up and reunited, and Mother repeatedly assaulted Father or his property. Thus, although all but one instance of domestic violence was committed by Mother against Father, the record firmly establishes that there was a history or pattern of domestic violence between the parents, and the Department sought to restrict Father's conservatorship and visitations rights due to concerns that he and Mother were still in a relationship and that he would allow Mother access to the child. *See id.* § 153.004(e).

The parents testified that they are no longer in a relationship and will not reunite in the future, with Father asserting that he had last seen Mother in January or March 2021, but multiple witnesses expressed doubt and skepticism about those assertions. Jaramillo had concerns because in October 2021, Mother asked Father to return to the home, and Father "den[ied] the relationship" but also said "that if her mental health was right, then maybe." Noyes testified that

the parents had a "repeated pattern" of breaking up and reuniting and were back in a relationship in June or July 2021 and had told her that they loved each other and wanted to continue their relationship. In August 2021, Father told Medellin that he was still in contact with Mother and was supporting her financially, and she believed the parents might still be in a relationship or might reunite in the future. Medellin was also skeptical about whether Father wanted to go through with the pending divorce and testified that Father struggles to understand "appropriate boundaries" and to be a protective parent to Yuri as related to Mother, to put Yuri's interests "first before [Father's] relationship with [Mother]," and "just to sever that tie" with Mother. Aunt thought Father might still be in a relationship with Mother, although she did not testify as to any concrete reasons for that belief. Further, when Mother was asked whether she and Father were continuing their relationship, she responded, "At this point I'm just not sure," although she then stated that they were not. There was conflicting evidence, therefore, about the parents' current relationship status and their intentions about the future.

Moreover, Medellin thought that Father underestimated the severity of Mother's condition and the danger she could pose to Yuri and was concerned that Mother and Father might "gang up on" Aunt to pressure her to allow Mother access to Yuri. Father had expressed to Medellin that he wanted Yuri to have contact with Mother, and Medellin worried that if Father were not supervised, he would allow Mother access to the child. Father said at trial that he did not think Mother posed a danger to the children, despite believing that she has issues with anger management and her mental health. And although he admitted to a history of domestic violence between him and Mother, he also downplayed the violence, describing it as a "mistake twice or three times" and "like any normal couple."

"The parental presumption under Section 153.131 is removed when there is a 'finding of a history of family violence involving the parents of a child.'" *In re J.J.G.*, 540 S.W.3d 44, 56 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (quoting Tex. Fam. Code § 153.131(b)). And, "[a]s conservatorship determinations are 'intensely fact driven,'" the trial courts are in the position to observe the witnesses' demeanor and personalities and to discern "the forces, powers, and influences that cannot be discerned by merely reading the record." *In re J.J.R.S.*, 627 S.W.3d at 218 (quoting *Lenz*, 79 S.W.3d at 19; *Echols*, 85 S.W.3d at 477). "A trial court's determination of what is in the child's best interest, specifically the establishment of terms and conditions of conservatorship, is a discretionary function." *Id.*

Given the history of domestic violence between the parents and Father's pattern of reuniting with Mother despite her violent and erratic behavior, it would not have been an abuse of discretion for the associate judge and referring court to disbelieve the parents' testimony that they were no longer in a relationship and would not reunite in the future. Nor would it have been an abuse of discretion to instead credit the Department's witnesses' concerns about the likelihood that Father was still with Mother or that he would allow her access to Yuri because he did not believe she posed a risk. The evidence established an act of domestic violence by Father against Mother and a history or pattern of domestic violence on Mother's part, and because the associate judge and referring court could have concluded that Father and Mother had resumed their relationship, they also could have determined that it was not in Yuri's best interest for Father to have unsupervised visitation. *See* Tex. Fam. Code § 153.004(a), (c), (e). We cannot hold that it was an abuse of discretion to determine that Yuri's best interest is served by Father being awarded possessory conservatorship and being given supervised visitation, thus ensuring that Father does

33

not place Yuri at risk by allowing Mother access to the child.  *See id*.  We overrule Father's issues on appeal.

## CONCLUSION

Having overruled the parents' issues, we affirm the orders terminating Mother's parental rights to Yuri and Derek, naming Father Yuri's possessory conservator, and requiring that his visitation be supervised.

_____

Edward Smith, Justice

Before Justices Baker, Smith, and Jones*

Affirmed

Filed:   July 7, 2023

* Before J. Woodfin Jones, Chief Justice (Retired), Third Court of Appeals, sitting by assignment. *See* Tex. Gov't Code § 74.003(b).

34